UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 1:15-cv-21850—MARTINEZ/GOODMAN

---------------------------------------------------------------X
                                                               )
BARCLAYS CAPITAL INC.,                                         )
                                                               )
        Movant,                                               )
                                                               )
vs.                                                            )
                                                               )
ILEANA D. PLATT and RAFAEL URQUIDI,                            )
                                                               )
        Respondents.                                          )
                                                               )
---------------------------------------------------------------X

**MEMORANDUM IN OPPOSITION TO MOTION TO VACATE
AND IN SUPPORT OF CROSS-MOTION TO CONFIRM ARBITRATION AWARD**

COFFEY & BURLINGTON, P.L.
2601 SOUTH BAYSHORE DRIVE, PENTHOUSE
MIAMI, FLORIDA 33133
TELEPHONE: (305) 858-2900

SUSMAN GODFREY LLP
560 LEXINGTON AVENUE, 15TH FLOOR
NEW YORK, NEW YORK 10022
TELEPHONE: (212) 336-8330

**Preliminary Statement**

In 2013, Movant Barclays Capital Inc. ("Barclays") made the decision to prevent its brokers from doing further business in any country in Latin America and South America—issuing a list of jurisdictions (that even bizarrely included Puerto Rico) from which it would no longer accept clients. This had a predictably devastating effect on its Latin America-focused brokers such as Respondents Ileana Platt and Rafael Urquidi, whom Barclays had recruited away from Credit Suisse less than a year earlier. Because nearly all of their clients were being ordered to leave Barclays, Ms. Platt and Mr. Urquidi had no choice but to leave themselves. In the process, Ms. Platt and Mr. Urquidi lost a large number of clients that they had served for years, and that they hoped to serve for many years to come.

Not surprisingly, when Barclays then attempted to enforce the terms of the promissory notes that it had given Ms. Platt and Mr. Urquidi to accompany their large signing bonuses, Barclays was unsuccessful. The panel of three FINRA arbitrators that ruled on Respondents' dispute with Barclays split their decision right down the middle, rejecting Respondents' claim for damages in its entirety, but also denying Barclays's attempt to claw back the bonuses they had given Respondents to induce them to come to Barclays in the first place. This decision was entirely in line with numerous instances of FINRA panels refusing to enforce promissory notes issued by banks to brokers with signing bonuses when the banks' own actions later forced those brokers to leave.

Barclays is understandably disappointed with that result, in part because they are engaged in similar litigation with numerous other former brokers who specialized in Latin American and South American clients, another group of which was *also* recently successful in preventing Barclays from enforcing the promissory notes in full. Barclays therefore has filed this frivolous

1

motion to vacate the award—but only the part that went against the bank—based on a misleading account of the facts.

Barclays falsely states that the Chairperson of the arbitration panel "failed to disclose to Barclays that his nine-member CPA firm had been retained and compensated approximately $60,000 to give expert testimony for two other former employees against Barclays in a virtually identical FINRA case." (Movant Br. at 2.) This allegation is entirely false for at least two fundamental reasons:

First, and most importantly, Jerrold Levine—the Chairperson of the arbitration panel—was no longer a member of the CPA firm (Pinchasik, Yellen, Muskat and Stein) to which Harvey Muskat, an expert witness in a hearing before a different panel, belonged; in fact, in the second and separate arbitration against Barclays (the "Second Proceeding"), Muskat testified under oath that Mr. Levine had *already retired*, that he no longer had an office at the firm, and that Mr. Levine no longer even visited from time to time. Barclays's omission of this critical testimony from its moving papers is highly misleading.

Second, it is false that Mr. Levine failed to disclose that his former firm had been retained by other former Barclays employees who had paid his former firm $60,000, because there is literally *zero evidence* that Mr. Levine ever knew that Mr. Muskat had been retained in the Second Proceeding. Barclays simply assumes this to be the case. And even if Mr. Levine knew about the engagement, the fact that his former colleague was retained to perform a damages calculation in a separate proceeding before a separate FINRA panel would not require any disclosure, let alone give rise to a "reasonable impression of partiality."

On the contrary, the evidence shows that Mr. Levine did *exactly* the right thing: that when Mr. Muskat called Mr. Levine (a call that happened without the knowledge, let alone consent, of counsel for Ms. Platt and Mr. Urquidi) to ask if it would be a conflict for Mr. Muskat

2

to appear before his panel as a witness, Mr. Levine told him that it would "certainly create a conflict." And Mr. Muskat never was retained in nor appeared as a witness in the proceeding before Mr. Levine. There was therefore nothing for Mr. Levine to disclose.

Barclays's second argument for partial vacatur of the arbitration award is equally baseless. Barclays argues that the three arbitrators somehow "exceeded their powers" by rejecting Barclays's contractual argument (although Barclays apparently believes the arbitrators acted entirely within their powers when they rejected Respondents' claim for damages). This argument is entirely inconsistent with the law of arbitration, and should be summarily rejected.

## Arguments & Authorities

### I.     Legal Standards

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, governs this case and "imposes a heavy presumption in favor of confirming arbitration awards." *Riccard v. Prudential Ins. Co. of Am.*, 307 F.3d 1277, 1288 (11th Cir. 2002). The Eleventh Circuit has made clear that "federal courts should defer to an arbitrator's decision whenever possible," *Frazier v. CitiFinancial Corp., LLC*, 604 F.3d 1313, 1321 (11th Cir. 2010) (citation omitted), and has described the confirmation of arbitration awards as "usually routine or summary." *Riccard*, 307 F.3d at 1288.

It is also "well settled that judicial review of an arbitration award is narrowly limited." *Davis v. Prudential Sec., Inc.*, 59 F.3d 1186, 1190 (11th Cir. 1995); *see also Robbins v. Day*, 954 F.2d 697, 683 (11th Cir. 1992), *overruled on other grounds, First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 948 (1995) ("The [FAA] does not allow courts to 'roam unbridled' in their oversight of arbitration awards, but carefully limits judicial intervention to instances where the arbitration has been tainted in specific ways."); *Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 843 (11th Cir. 2011) ("[A]rbitrators do not act as junior varsity trial courts where subsequent appellate review is readily available to the losing party." (citation and internal

3

quotation marks omitted)). Indeed, "judicial review of arbitration decisions is among the narrowest known to the law." *AIG Baker Sterling Heights, LLC v. American Multi–Cinema, Inc.*, 508 F.3d 995, 1001 (11th Cir. 2007) (citation and internal quotation marks omitted).

Section 10 of the FAA permits vacatur of arbitration awards in only four narrow circumstances:

> (1) Where the award was procured by fraud, corruption, or undue means;
>
> (2) Where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy, or of any other misbehavior by which the rights of any party may have been prejudiced; or
>
> (4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made.

9 U.S.C. § 10(a)(1)-(4). Barclays asserts that two of these grounds are relevant here. Barclays alleges that the arbitrators "exceeded their powers," *id*. §10(a)(4), in ordering that the bonuses structured as forgivable loans that Barclays made to Ms. Platt and Mr. Urquidi should be "forgiven." Barclays also claims that there was "evident partiality" due to an alleged "conflict of interest" in one of the arbitrators on the three-member panel, *id*. §10(a)(2).

When applying these grounds, the Eleventh Circuit has cautioned that courts "must always bear in mind that the basic policy of conducting arbitration proceedings is to offer a means of deciding disputes expeditiously and with lower costs than in ordinary litigation." *Schmidt v. Finberg*, 942 F.2d 1571, 1573 (11th Cir. 1991); *see also Booth v. Hume Pub., Inc.*, 902 F.2d 925, 933 (11th Cir. 1990) ("The Act's enunciation of specific defenses to a petition to confirm an award 'was not intended to overthrow the general advantage of speedy and effective decision of disputes by arbitration and the creation of these general grounds does not obliterate

4

the hesitation with which courts should view efforts to re-examine awards. To do otherwise would defeat the primary advantages of speed and finality which led to the development of arbitration . . . .'" (citation omitted)). For the reasons set forth below, both of the grounds raised by Barclays are meritless and should be rejected.

II. <u>The Unanimous Panel Decision Did Not Exceed The Arbitrators' Powers</u>

Barclays argues, in essence, that the arbitration panel disregarded the law and thus "exceeded its powers" in stating in its Award that the retention bonuses structured as forgivable loans made to Respondents should be "forgiven." On the contrary, the Panel's decision was well-supported in the law and consistent with FINRA and court precedent, as well as the pleadings and testimony elicited at the three-day hearing.

a. **<u>The Award Cannot be Vacated for "Manifest Disregard of the Law"</u>**

As a threshold matter, Barclays's argument is foreclosed because of the limited bases for review of arbitration decisions. As another court in this district has recently observed, "manifest disregard of the law does not provide a basis for vacatur of an arbitration award in the Eleventh Circuit." *Pochat v. Merrill Lynch*, No. 12-Civ.-22397 (RSR), 2013 WL 4496548, at *8-9 (S.D. Fla. 2013). The court in *Pochat* reviewed Eleventh Circuit law on the issue and concluded that "no basis exists for vacating an arbitration award for manifest disregard of the law." *Id.* at *9, citing *White Springs Agric. Chems., Inc. v. Glawson Invs. Corp.*, 660 F.3d 1277, 1280 (11th Cir. 2011). The court refused to address the merits of the loan dispute between the parties to determine whether the arbitration panel had disregarded the law or not.

Barclays relies heavily in its motion papers on *Stolt-Nielsen S.A. v. AnimalFeeds Intl. Corp*, 559 U.S. 662, 671 (2010). For several reasons, that reliance is misplaced. *Stolt-Nielsen* predated and was in fact considered by the Eleventh Circuit in cases such as *White Springs*. *Stolt-Nielsen* itself recognized that it was undecided whether "manifest disregard of the law" remained

5

a valid ground for upsetting an arbitration award, *id* at 672 n.3, but in that case the party defending the arbitration result had conceded that review was available where the arbitrators had refused to follow the governing law, *id.* The Eleventh Circuit has since answered the question left open by *Stolt-Nielsen* and *rejected* the kind of review that Barclays seeks here. Further, *Stolt-Nielsen* did not deal with an underlying questions on the merits—did the arbitrators reach the right outcome or not given the parties' substantive rights—but rather had to do with a procedural question of the scope of the arbitration agreement and thus the arbitrators' authority—did the arbitration agreement contemplate a class arbitration or require arbitration on an individual basis? This is also true of the other case cited by Barclays in support of its proposed standard of review, *Oxford Health Plans LLC v. Sutter*, 133 S.Ct. 2064 (2013) (approving class arbitration). By limiting its discussion of *Stolt-Nielsen* to sound bites, Barclays overlooks the differences between that case and this one. The merits review that Barclays demands is unavailable under the law.

b. **The Panel Properly Ruled on the Enforceability of Barclays's Loans**

To the extent that Barclays contends that the issue of loan forgiveness was not presented to the Panel, and thus that the arbitrators acted outside the scope of their authority in considering it, this argument is meritless. Contrary to Barclays's motion, which falsely implies that Chairperson Levine somehow invented the remedy of loan "forgiveness," Ms. Platt and Mr. Urquidi asserted from the very beginning of the case that they should not be required to repay their signing bonus loans after Barclays destroyed their ability to conduct their business. Count 6 of their arbitration demand sought a declaratory judgment that "they owe nothing on the Notes and that Barclays take nothing in this arbitration" as a result of "Barclays's unilateral termination of Claimants' business." (Russell Aff. Ex. 1 at 10.) And the FINRA panel stated in its Award that Claimants sought "a declaratory judgment that any amount due under their 'loan'

6

agreements would be subject to an equitable setoff and that they would owe nothing under the Notes." (*Id.* Ex. 4 at 2.)

Further, in response to Barclays's counterclaim seeking to enforce the loans, Ms. Platt and Mr. Urquidi filed a reply, attached to the affidavit of Jacob W. Buchdahl as Exhibit 1. Barclays ignored this pleading in its motion to vacate, but it expressly asked for Barclays's claim for payment of the notes to be rejected, noting that Barclays had "forfeited" their right to repayment, and that prior FINRA decisions had "excuse[d]" the repayment of loan obligations in this context. *Id.* ¶¶1, 3, 8. In fact, Ms. Platt and Mr. Urquidi specifically noted that the loans provided by Barclays were by their very terms intended to be forgiven over time as Ms. Platt and Mr. Urquidi worked at Barclays as the parties intended—an arrangement that Barclays unilaterally frustrated. *Id.* ¶6; *id.* at page 4. This point was emphasized at the hearing numerous times.[1] At the end of the day, there is no question that Ms. Platt and Mr. Urquidi requested the relief that the Panel awarded. The fact that Mr. Levine, a non-attorney, described this remedy as loan "forgiveness" is altogether unsurprising.

In *Pochat*, the court addressed a similar situation, where the bank movant asked that an arbitration be vacated because the panel had allegedly ruled on an issue—failure to supervise—that had not been submitted to it by the other party, a former bank employee. 2013 WL 4496548, at *13. While those specific words—"failure to provide adequate supervision"—had not been used by the employee, the court noted that the essence of the claim had been urged to the panel in pleadings and at the hearing and that it was properly evaluated by the panel. *Id.* at *15 (noting that "[b]ased on the record" the issue was properly submitted to the panel, even though employee "may not have employed the exact phrase that the Arbitrators did in the Award ('failure to provide adequate supervision')"). That is the same situation here: whether termed as

---

[1] Russell Aff., Ex. 10, Platt Tr. at Vol. 1, 71:6 - 72:5; Platt Tr. at Vol. 3, pg 51:6-9; Platt Tr. at Vol. 5, 119:7-120:10.

7

"forgiveness," "excuse," "estoppel," "setoff," or otherwise, the issue of the fundamental enforceability of Barclays's notes was squarely before the Panel and repeatedly emphasized during the hearing.

    c.  **There Was a Strong Legal Basis for the Panel's Refusal to Enforce Barclays's Loans**

As set forth above, the FAA does not permit the panel's decision to be vacated solely on the basis that it allegedly "manifestly disregarded the law." But even if that type of review were available, Ms. Platt and Mr. Urquidi had ample legal basis to ask FINRA not to enforce the promissory notes. Time and again, FINRA panels have ruled that if a bank changes the terms, even the unwritten terms, of brokers' employment contracts, and that change damages the brokers' ability to repay the promissory notes they had received with their promissory notes, the bank is unable to collect. For example, *UBS v. Brennan*, a FINRA arbitration decided on August 1, 2011, involved an attempt by UBS to force two of its brokers, hired to work in Kalamazoo, Michigan, to move their office to Grand Rapids, Michigan. The FINRA panel described this as a "dramatic and unilateral" change in the terms of their employment, and for that reason, FINRA forgave 40% of the brokers' indebtedness to UBS.[2] As just one more example, in February of 2013, a FINRA panel ruled in *Morgan Stanley v. Carreras* that Morgan Stanley was unable to collect a single dime on promissory notes. In that case, Morgan Stanley had induced a pair of brokers to move to Morgan Stanley by telling them their clients could keep assets in Swiss banks, but then turned around and said that its Swiss platform would no longer be available. In that case, Morgan Stanley was not only unable to collect on the promissory notes, but FINRA (unlike here) awarded over a million dollars in lost commissions to the brokers.[3] In fact, as was addressed at the hearing, in recent years there have been no fewer than seventeen decisions in

---

[2] *See* Buchdahl Aff Ex. 2.
[3] *See* Buchdahl Aff. Ex. 3.

which FINRA panels had refused to enforce—in whole or in part—similar promissory notes given to brokers at other banks.[4]

In the case of Ms. Platt and Mr. Urquidi, what Barclays did was just as unilateral as those other banks' actions. But in many ways what Barclays did was much worse for the brokers, because its decision to shutter its operations in Latin America meant that virtually all of Ms. Platt's and Mr. Urquidi's clients had to leave the bank just months after they had arrived. Ms. Platt's and Mr. Urquidi's employment agreements with Barclays were completely silent on what the consequences would be if Barclays decided to inform nearly all of their clients that they could no longer keep their assets at Barclays—essentially showing them all the door.[5]

Given that the parties' contracts did not specifically address the unique situation that arose—the unexpected and unprecedented closure of the Latin American business less than a year after Ms. Platt and Mr. Urquidi came to the firm—the arbitrators were entitled to fill the gap in the parties' agreement, whether as a matter of equity, reliance on the covenant of good faith and fair dealing, or via a claim of unjust enrichment, all of which were asserted by Respondents in the arbitration. *See, e.g., In re Port Authority of N.Y. & N.J. v. Port Authority Police Benevolent Ass'n, Inc.*, 99 A.D.3d 497,497 (1st Dep't 2012) (holding "[t]he arbitrator did not exceed her powers in making the award, as the contract language to which petitioner points does not address the situation at issue in this matter."); *Wakefield v. Northern Telecom, Inc.*, 769 F.2d 109 (2d Cir. 1985) (employer's termination of an at-will employee for purpose of avoiding payment of commissions may breach the implied covenant of good faith and fair dealing, despite the employee's status as an at-will employee); *Union Bank, N.A. v. CBS Corp.*, No. 08 Civ. 8362

---

[4] Russell Aff., Ex. 10, Platt Tr. at Vol. 5, 118:10-23

[5] The strong basis for cancellation of the notes was shown at the hearing by the fact that in Ms. Platt's own dealings with another bank that had—like Barclays—decided to terminate the Latin American business, the bank voluntarily paid down the remaining balance on the loan. *Id.*, Platt Tr. at Vol. 1 85: Exhibit 10 Volume 1 pg 85:12-87:25.

(PCG), 2009 WL 1675087, at *7 (S.D.N.Y. June 10, 2009) (declining to dismiss unjust enrichment claim where contract did not "clearly cover[] the dispute between the parties," and "resolution of the dispute" might require "going outside the four corners of the parties' agreements").[6]

There was also support for the arbitrators' decision in the text of the employment agreements themselves. Barclays focuses on the terms of the promissory notes in isolation, and on the fact that Ms. Platt and Mr. Urquidi were "at will" employees whose employment could be terminated for any reason. But as Ms. Platt and Mr. Urquidi argued during the hearing, the employment agreements did not foreclose the availability of relief against Barclays based on the consequences of Barclays's decisions, and they specifically recognized that employees may have claims against the bank in circumstances such as those set forth here. Specifically, the parties' employment agreement recognized that if Ms. Platt and Mr. Urquidi were terminated without cause within two years of their start date, they would receive a specified payment (not coincidentally equal to a partial pay-down of their loans) *as long as they released all potential claims against Barclays.*[7] Barclays recognized that brokers released shortly after their hiring may have claims against the bank based on the consequences of their termination. In this case where Barclays's actions destroyed Ms. Platt's and Mr. Urquidi's client list and potential for future business, the Panel was well within its power to grant "forgiveness" of outstanding loan amounts. That was appropriate and equitable relief given that, as was emphasized throughout the

---

[6] For these reasons, even if cases like *Stolt-Nielsen* or *Oxford* had resonance in this substantive dispute about the merits—and they do not—Barclays's argument is meritless. As the Court observed in *Oxford* (there in the context of a dispute concerning the scope of the arbitration at issue, *not* on the merits), "[a]n arbitral decision 'even *arguably* construing or applying the contract' must stand, regardless of a court's views of its (de)merits." 131 S.Ct. at 2068 (emphasis added), citing *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000).

[7] Buchdahl Aff., Exs. 5-6, at 3.

10

arbitration, the parties had contemplated that Ms. Platt's and Mr. Urquidi's obligations would in fact have been forgiven over time by Barclays if their business had not been closed.[8]

For all of these reasons, it was not at all unusual that the FINRA arbitration panel, like the ones in *Brennan* and *Carreras*, interpreted the parties' contracts to prohibit Barclays from clawing back the signing bonuses it had given Ms. Platt and Mr. Urquidi less than a year before Barclays shut them down. And the argument that in doing so the FINRA panel somehow "exceeded its authority" is entirely frivolous. In fact, the FINRA panel in the Second Proceeding, which had no connection to Mr. Levine, reached a similar conclusion, holding that the former Barclays brokers only had to pay a fraction of the face value of the promissory notes—the balance of the debt being implicitly forgiven. (Barclays neglects to mention this in its papers. *See* Buchdahl Aff., Exhibit 4.)

### III. There Was No Potential Conflict, Evidence of Bias or Prejudice to Barclays

Barclays's next argument is that there was "evident partiality" as to one of the arbitrators, Chairperson Levine. The "evident partiality" exception is to be strictly construed, and the party making a claim of partiality bears the burden of persuasion. *Gianelli Money Purchase Plan & Trust v. ADM Investor Servs.*, 146 F.3d 1309, 1312 (11th Cir. 1998). A party challenging an arbitration award must show that the alleged partiality is "direct, definite and capable of demonstration rather than remote, uncertain and speculative." *Id*. (internal quotation and citation omitted). "The mere appearance of bias or partiality is not enough to set aside an arbitration award." *Lifecare Intern., Inc. v. CD Medical, Inc.*, 568 F.3d 429, (11th Cir. 1995), *modified on other grounds by Lifecare Intern., Inc. v. CD Medical, Inc.*, 685 F.3d 519 (11th Cir. 1996); see also *Al–Harbi v. Citibank, N.A.,* 85 F.3d 680, 683 (D.C. Cir. 1996) ("the burden on a claimant for vacation of an arbitration award due to 'evident partiality' is heavy, and the claimant must

---

[8] *See supra* n. 1.

11

establish specific facts that indicate improper motives on the part of an arbitrator." (emphasis added)); *Brandon Jones Sandall Zeide Chalal & Musso, P.A. v. Beasley & Hauser, P.A.*, 925 So.2d 1142, 1145 (Fla. Dist. Ct. App. 2006) (noting that pursuant to § 682.13(1), Fla. Stat., not only must the partiality of the neutral arbitrator be "obvious and plain," it must also be shown to have "unfairly affected the rights of the complaining party."). In addition, and critically in this case, numerous courts have indicated that where a panel decision is unanimous, an allegation of partiality as to a single arbitrator does not give rise to vacatur. *See Cont'l Cas. Co. v. Staffing Concepts, Inc.,* No. 8:09–CV–02036–T–23, 2011 WL 7459781, at *4 (M.D. Fla. Dec. 20, 2011) (report and recommendation citing authorities), *adopted in full by* 2012 WL 715652 (M.D. Fla. Mar. 5, 2012).

Applying these standards, Barclays's argument concerning partiality should be rejected on its face. Barclays seeks the unprecedented vacatur of *only the portion of the award that went against it*, leaving in place the dismissal of Ms. Platt's and Mr. Urquidi's claims for damages by the allegedly "tainted" panel. Barclays alleges *no* partiality as to two of the three arbitrators that issued a *unanimous* decision. And Barclays's allegations as to even one of the arbitrators, Mr. Levine, are the very definition of "remote, uncertain, and speculative."

Barclays's argument that Mr. Levine's single conversation with his former colleague Mr. Muskat taints the arbitration is built on an implausible set of assumptions: First, it assumes that Mr. Levine improperly concealed information involving Mr. Muskat from the parties to this case. But there was nothing for Mr. Levine to disclose, given that he had been sensitive enough to the potential conflict that he immediately rejected the idea that Mr. Muskat appear before him, which in fact never happened. There is no allegation or evidence suggesting any further conversations between Mr. Levine and Mr. Muskat relating in any way to this case.

12

Second, Barclays's argument assumes that Mr. Muskat disclosed to Mr. Levine that he had been engaged in the separate arbitration between other former Barclays employees and the bank, but there is *no* evidence in the record to support that conclusion. (And of course, that separate case did not involve Ms. Platt, Mr. Urquidi, or their counsel.)

Third, Barclays assumes that Mr. Levine would somehow be biased toward Ms. Platt and Mr. Urquidi simply because those *other* former Barclays brokers in a *separate* proceeding had elected to retain Mr. Muskat as a damages expert. (*See* Russell Aff. Ex. 11, at 142 ("I'm not opining on the liability here. I'm just calculating the numbers.").) There is no basis for such a speculative conclusion. Even had the conversation that Barclays imagines actually transpired, like most experts, Mr. Muskat was paid by the hour, and therefore his compensation had no relationship to the outcome of the case. Barclays's counsel established this hourly arrangement in questioning Mr. Muskat in the Second Proceeding. *See* Russell Aff., Ex. 11, at 102-03. For this reason, neither Mr. Levine nor Mr. Muskat would have been in a position to benefit—directly or indirectly—from a decision in favor of Ms. Platt or Mr. Urquidi in this case.

Finally, Barclays asks this Court to assume that Mr. Levine was biased by his former colleague's retention as a damages expert in a separate proceeding, even though the evidence shows the opposite: Mr. Levine's judgment was consistent with that of two other arbitrators who had no alleged partiality, and the panel *declined to award any damages* to Ms. Platt and Mr. Urquidi on their claims against the bank.

The evidence shows that Mr. Levine did everything FINRA could expect as an arbitrator. Mr. Levine's biographical information, which included the Pinchasik Yelen firm, was current as of July 30, 2014. (Russell Aff. Ex. 3 at 1.) This in no way contradicts Mr. Muskat's sworn testimony in March of 2015 that Mr. Levine was "retired" (*id.* Ex. 11 at 103:24), that "now he doesn't even come to the office any more" (*id.* 104:3-4), and that he no longer had an office at

13

the firm (*id.* 105:9-11). Despite the lack of any continuing professional connection, when counsel for Ms. Platt and Mr. Urquidi asked counsel for Barclays if he had any objection to Mr. Muskat appearing as an expert, counsel for Barclays objected (after telling Claimants' counsel that he had checked Mr. Muskat's firm's website). (Russell Aff. ¶ 6.) Claimants' counsel proceeded no further. And when Mr. Muskat independently asked Mr. Levine if it would be a conflict to appear in front of his former colleague, Mr. Levine, in an abundance of caution, responded that it would "certainly create a conflict." (*Id.* 104:13-14.) When Mr. Muskat never appeared as a witness, Mr. Levine had nothing to disclose.

Barclays's brief then proceeds from the implausible to the inaccurate. Barclays claims that "Mr. Muskat testified that, at the time of his discussion in January 2015 with Mr. Levine, their CPA firm had already been engaged to testify for Gallo and Adams, for which the firm—of which Levine and Muskat are members—was compensated approximately $60,000." (Barclays Br. at 14.) This statement is highly misleading. First, there is no evidence that Mr. Muskat told Mr. Levine about his engagement in the Second Proceeding; on the contrary, Mr. Muskat testified that he didn't remember whether the subject ever came up. (Russell Aff. Ex. 11 at 105:1-8.) Second, Mr. Muskat specifically denied that he and Mr. Levine were still members of the same firm (*Id.* at 103-104), a denial that Barclays completely ignores in its brief. Third, there is no evidence that when Mr. Muskat and Mr. Levine spoke in January 2015—more than six weeks before the hearing in the Second Proceeding—Mr. Muskat's firm had been paid anything at all, let alone that any money could have or would have gone to Mr. Levine. The allegation that Mr. Levine had anything to gain financially from the Second Proceeding is entirely unsupported by the evidence.

While it is true that Mr. Levine did not disclose that he had a conversation about a *potential* engagement for Mr. Muskat, the circumstances of the conversation did not give rise to any need for disclosure. Below is the entirety of the testimony on the subject:

> Q. And [Jerrold] Levine?
> A. ***He's retired***.
> Q. But, he's shown on your website as being a member of the firm.
> A. But, ***he's really not***. He's been—he's been hanging around for years. But, now ***he doesn't even come to the office any more***.
> Q. But, you spoke with him about your potential engagement in this case, didn't you?
> A. ***Not this case***. There was another case I was asked to be an expert, where he was actually on the panel. And I notified the attorney that—a person who we were—was—was "a member of our firm" for many years, was on the panel.
> Q. So—
> A. And I talked to [J]erry. And he said it would certainly create a conflict.
> Q. Mmm-hmm.
> A. So, I was unable to serve as an expert in that case.
> Q. Okay. So, that was in early January of 2015?
> A: I thought the case actually started in—the first week of February, or something like that. Or second week in February.
> Q: But, your discussion with him was in January of 2015?
> A. It would have been, yeah.
> Q. Okay. And you told him you were going to go ahead and take this assignment for a different case; correct?
> A. ***I don't know***.
> Q. The Gallo Adams case.
> A. ***I don't know***.
> Q. What do you mean you don't know?
> A. ***I don't remember. I'm sorry. I don't remember***.
> Q. But he—he still has an office at the firm, doesn't he?
> A. ***No***.
> Q. He comes in from time to time?
> A. ***No***.
> Q: So, you communicate with him by email or phone?
> A: I had actually called him.
> Q: Okay.
> A: I was kind of hoping he would step down from the panel, so I could be the expert. But, he didn't see it that way.

(Russell Aff. Ex. 11 at 103:23-105:20) (emphasis added). Barclays makes much of the fact that the firm's website had not been updated since Mr. Levine retired, but yet he elected *not* to cross-examine Mr. Muskat with the fact that Mr. Levine remained on the firm's website, despite learning of it before the hearing. (Russell Aff. ¶ 11 & Ex. 6.) The fact that Mr. Levine

15

and Mr. Muskat are only *former* (and not current) partners is material, because Barclays falsely attempts to imply that Mr. Levine had a financial interest in Mr. Muskat's later testimony.

Moreover, there was no attempt to take advantage of the relationship between these two former colleagues. On the contrary, Mr. Muskat wanted to testify at the proceeding *instead* of having Mr. Levine chair the arbitration panel; Mr. Levine made it clear that wasn't going to happen; and there is no evidence that anything else was discussed. Mr. Levine told Mr. Muskat to stay away in order to *avoid* a conflict; the most obvious inference from Mr. Levine's caution in this interaction is that Mr. Levine had no idea that Mr. Muskat had been retained in a separate case against Barclays. Moreover, had Mr. Levine disclosed this phone call on the morning the hearing was to begin and had Barclays objected, Mr. Levine readily could have rejected the request for the simple reason that "the challenge [was] not substantial" and that he could "act and decide the case impartially and fairly." (Russell Aff. Ex. 12 at page 29, citing FINRA Rule 12406.)

Barclays improperly argues in its brief that Mr. Levine violated FINRA's Code of Procedure, but this is as baseless as well. Mr. Muskat was not a "current" partner of Mr. Levine, *see* FINRA Code of Procedure 13408(a)(3). Even if he was, for reasons set forth above, the brief conversation that Mr. Levine and Mr. Muskat had, which ended in Mr. Levine declaring that Mr. Muskat's retention in this case would "certainly" pose a conflict, would not preclude him from "rendering an objective and impartial determination in the proceeding," or be "likely to affect impartiality" or "reasonably create an appearance of partiality or bias." *Id*. (a)(2). This case "involves a situation that is more in the line of remote, uncertain, and speculative partiality or a mere appearance of bias or partiality, as opposed to bias or partiality that is direct, definite, and capable of demonstration," *Lifecare Intern., Inc. v. CD Medical, Inc.*, 68 F.3d 429, 433-34 (11th

16

Cir. 1995) (no potential conflict where arbitrator failed to disclose dispute with attorney from losing party's law firm until after liability hearing).

It strains credulity that there is "bias or partiality that is direct, definite, and capable of demonstration" based on these facts: a single arbitrator out of a panel of three that had a prior professional relationship to a damages expert in a similar case. And while Barclays now claims that they "never would have accepted the panel" due to this alleged "conflict of interest" (Barclays's Br. at 15), the way in which this argument has been raised suggests strategic motives for the bank's belated and meritless request.

The salient facts were available to counsel for Barclays more than a week prior to the Panel's Award. Barclays knew that Mr. Muskat was going to be a witness before the Platt/Urquidi Award was ever issued, and could have raised the issue with the Panel in that case beforehand (had it truly believed it was an issue).[9] But Barclays not only waited until after the Award was issued to file this motion to vacate, it waited over two months after the Second Proceeding. Why? Because Barclays has a third FINRA arbitration proceeding against former financial advisors beginning in June, and still more to come, and Barclays wants this motion to be in place—but undecided—in order to be able to undermine the validity of the Award during that June hearing. Barclays knows that after losing its first attempt to claw back signing bonuses issued to the brokers it forced out of a job, it will be that much more difficult for it to prevail in subsequent attempts. This meritless motion to vacate is part of Barclays's broader strategy to try

---

[9] On February 10, 2015, over a week before the Award was issued in this case, Mr. Muskat was disclosed to Barclays as one of Claimants' witnesses in the Second Proceeding, and he was identified as belonging to "Pinchasik Yelen Muskat Stein, LLC." (Russell Aff. Ex. 5 at 1.) Barclays already knew at this time that Mr. Levine had been associated with this firm for two different reasons. First, Mr. Levine had disclosed his relationship with the firm as of July 2014. (*See* Russell Aff. Ex. 3 at 1.)  Second, counsel for Ms. Platt and Mr. Urquidi already had raised the issue of retaining Mr. Muskat with counsel for Barclays; counsel for Barclays objected, specifically noting that the website appeared to suggest they still worked together. (*See* Russell Aff. ¶ 6.)

17

to salvage its cases against all the other Latin American-focused brokers that lost their jobs as a result of Barclays's decision to prohibit Latin American clients in its wealth management business. This sort of gamesmanship should not be condoned.

### Conclusion

Respondents respectfully request that this Court deny Movant's motion to vacate the arbitration award and instead enter judgment confirming the award. Respondents also seek an award of attorneys' fees and expenses for the costs of this proceeding.

Dated:  June 1, 2015

By: /s/ David J. Zack
KENDALL COFFEY
DAVID J. ZACK
COFFEY &BURLINGTON, P.L.
2601 SOUTH BAYSHORE DRIVE, PENTHOUSE
MIAMI, FLORIDA 33133
TELEPHONE: (305) 858-2900
FACSIMLE: (305) 858-5261
EMAIL: KCOFFEY@COFFEYBURLINGTON.COM
EMAIL: DZACK@COFFEYBURLINGTON.COM


JACOB W. BUCHDAHL (*PRO HAC VICE* PENDING)
ARUN SUBRAMANIAN (*PRO HAC VICE* PENDING)
SUSMAN GODFREY LLP
560 LEXINGTON AVENUE, 15TH FLOOR
NEW YORK, NEW YORK 10022
TELEPHONE: (212) 336-8330
EMAIL: JBUCHDAHL@SUSMANGODFREY,COM
EMAIL: ASUBRAMA@SUSMANGODFREY.COM

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on June 1st 2015, I electronically filed the foregoing with the document with the Clerk of the Court using the CM/ECF filing system. I also certify that the foregoing document is being served this date on all counsel of record or pro se parties on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by the CM/ECF system or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

        s/David J. Zack
        David J. Zack

**SERVICE LIST**

| | |
|---|---|
| Thomas E. Scott | David G. Russell |
| Scott Cole | G. Wayne Hillis |
| COLE, SCOTT & KISSANE, P.A. | PARKER HUDSON RAINER & DOBBS LLP |
| 9150 South Dadeland Boulevard, Suite 1400 | 1500 Marquis Two Tower |
| Miami, Florida 33156 | 285 Peachtree Center Avenue NE |
| Telephone: (305) 350-5385 | Atlanta, Georgia 30303 |
| Facsimile: (305) 373-2294 | Telephone: (404) 523-5300 |
| Email: thomas.scott@csklegal.com | Facsimile: (404) 522-8409 |
| Email: scott.cole@csklegal.com | Email: drussell@phrd.com |
| | Email: whillis@phrd.com |

*Attorneys for Barclays Capital Inc.*